UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| ADONIAS TUCHEZ, | ) | CIV. 11-4058-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER GRANTING DEFENDANTS' |
| | ) | SUMMARY JUDGMENT MOTION |
| CITY OF SIOUX FALLS, a South | ) | |
| Dakota municipal corporation and | ) | |
| various other John Does to be | ) | |
| named when identified, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Adonias Tuchez, asserts a 42 U.S.C. § 1983 claim against

defendants, City of Sioux Falls and John Does. Tuchez alleges that defendants

violated his Fourth and Fourteenth Amendment rights. Defendants move for

summary judgment on all of Tuchez's claims. Docket 10. Tuchez resists.

On May 31, 2012, the court ordered oral argument on the motion for

summary judgment. The scheduling order stated that "[t]he court would like the

parties to be prepared to discuss all issues in this case and *Szabla v. City of*

*Brooklyn Park, Minn.*, 486 F.3d 385 (8th Cir. 2007) (en banc) and the cases cited

therein." Docket 26. During oral argument, both parties admitted that they had

not read *Szabla*. The court allowed the parties to submit supplemental briefs on

the application of *Szabla* to this case. Both parties submitted supplemental

briefs. The motion for summary judgment is granted.

## BACKGROUND

The pertinent facts to this order in the light most favorable to Tuchez, the nonmoving party, are as follows:

On October 29, 2009, special agent Craig Scherer with the United States Department of Homeland Security, Immigration and Customs Enforcement filed an application for a no-knock search and seizure warrant for 4413 E. Ronning Drive, apartment number three, in Sioux Falls, South Dakota, a white Ford Taurus and all other vehicles associated with residents at 4413 E. Ronning Drive, apartment number three, and all persons present at the time the warrant was executed. In his affidavit in support of the application for a search warrant, Scherer stated that he and other officers were investigating a drug organization in the Sioux Falls area, specifically at an apartment at 4413 E. Ronning Drive.

A confidential informant (CI) had informed Scherer that a person known as Armando had offered to sell the CI methamphetamine, cocaine, and guns. Armando later sold methamphetamine to the CI. Police records showed that Elmer Armando Rodriguez lived at apartment number two at 4413 E. Ronning Drive.[1] On October 17, 2009, Scherer instructed the CI to attend the El Paraiso dance and attempt to meet drug distributors.

---

[1] At some point in time, apartment number three was also utilized for drug activity. Armando's mother resided in apartment number two.

2

The CI attended the dance and an after-hours party at apartment number three at 4413 E. Ronning Drive. Approximately 25-30 people attended the party, and numerous people arrived at the apartment throughout the night to purchase drugs, especially methamphetamine. The CI watched at least one person snort methamphetamine. The CI further observed a black pistol and two shotguns in the apartment.

In addition to the CI's information, Scherer also received information about the apartment from an anonymous caller and a source of information (SOI). An anonymous person called the Sioux Falls Police Department (SFPD) stating that Armando was a drug distributor. An SOI reported to Scherer that he/she arrived at an apartment complex that he/she believed to be 4413 E. Ronning Drive. The SOI stated that a person was standing next to a car talking to Armando, who was sitting in the car's passenger seat. The SOI told Scherer that Armando pointed a black pistol at the person standing next to the car and told the person that he "better pay." Docket 18-2 at 6. The SOI believed that the person and Armando were talking about drugs and drug debts. An undercover special agent also purchased drugs from Armando in two separate controlled buys.

Scherer further based his application for a no-knock warrant on his personal knowledge and experience in law enforcement. In his affidavit, Scherer stated that based on his experience, "narcotics traffickers often

3

possess firearms, ammunition and other weapons." Docket 18-2 at 3. Furthermore, he knew "that persons involved with large quantities of controlled substances and currency often maintain weapons to protect their drugs and money. Based on this, the above information, and the inherent danger involved with executing drug related search warrants involving weapons, I am requesting a 'No Knock' service[.]" Docket 18-2 at 16.

Upon finding probable cause based on Scherer's affidavit, Judge Lawrence Piersol issued a no-knock search warrant. Docket 18. Tuchez concedes that Scherer's "affidavit contains the facts establishing probable cause for issuance of a no-knock search and seizure warrant." Docket 21 at 1.

On October 29, 2009, SFPD officers assigned to the Special Weapons and Tactics unit (SWAT) participated in the warrant's execution. Sergeant Steve Van't Hul, the SWAT commander, provided the assignments to the SWAT members. Officer Tim Suurmeyer was assigned to utilize a battering ram to open the apartment door. Officer David Andreasen was assigned to deploy a flashbang[2] manufactured by Defense Technology.

A flashbang is an incendiary explosive and is classified as a "destructive device" under the Bureau of Alcohol, Tobacco, Firearms, and Explosives'

---

[2] Flashbang devices have various names, including percussion grenade and distraction device. The device at issue here is a Number 25 distraction device manufactured by Defense Technology. The court will refer to the device as a "flashbang."

4

regulations. It is composed of 45 percent potassium percholoarte, 29 percent magnesium powder, and 26 percent aluminum powder. When the device is detonated, these chemicals react to produce an explosion with intense light, sound, heat, and blast pressure waves. A flashbang's detonation produces a sound rating of 174.5 decibels and creates a 1.63 PSI (pounds per square inch) of pressure for a five-foot range. Because it is a thermal-incendiary device, the flashbang creates a short-duration heat of approximately 2000° Celsius[3] upon detonation.

The device also produces a short, intensely bright flash, which measures an intensity of 6-8 million candela. A flashbang can combust and could cause a fire. The explosion and displacement of gases creates a shock front of force and velocity. The combination of light, noise, and smoke is intended to and does stun people within a close proximity to the flashbang's deployment. Defense Technology, the device's manufacturer, warns that deploying a flashbang may result in personal injury, property damage, or death.

Before the SWAT team executed the warrant, the subject thought to be armed left the residence. Officers arrested him during an uneventful traffic stop.

---

[3] 2000° Celsius is 3632° Fahrenheit. National Weather Service Forecast Office, http://www.wbuf.noaa.gov/tempfc.htm (last visited June 29, 2012).

Immediately prior to the warrant's execution, Tuchez arrived as a guest in the apartment. Tuchez and another individual were seated on one of two couches in the living room. The couch on which Tuchez was seated was located just inside and to the right of the apartment's entrance. Another individual was seated on the other couch.

When the battering ram broke the door, Tuchez was sending a text message to his wife. Law enforcement ordered the occupants to get on the floor.[4] All three individuals got down on the floor; no one else was in the apartment. When Tuchez was on the floor, he was only a few feet away from the apartment's doorway.

Andreasen placed or rolled[5] the flashbang into the apartment away from the other two individuals. The flashbang detonated near Tuchez.

When the flashbang exploded, Tuchez felt a strong blast against his foot and then felt an intense burning sensation in his foot. Either the flame or the blast caused a severe burn to his foot. An ambulance took Tuchez from the

---

[4] Tuchez "contends that he was ordered to get on the floor before entry was made into the room and that a percussion grenade was deployed after the occupants of the room had complied with the command." Docket 22 at 6.

[5] In his affidavit, Andreasen stated that he placed the device inside the apartment. Docket 19 ¶ 9 ("So I placed the distraction device near the door and away from those two individuals."). But in his memorandum to the SFPD regarding the warrant's execution, Andreasen stated that he "rolled the flash bang inside the doorway." Docket 20-2 at 14.

apartment to the hospital, where he remained for several days. Tuchez has undergone extensive medical treatment costing in excess of $20,000.

Tuchez brought suit against Sioux Falls and John Does to be identified later. Regarding Sioux Falls's liability, Tuchez alleges that Sioux Falls's policy regarding the use of flashbangs is unconstitutional, and Sioux Falls failed to adequately train Andreasen.

Sioux Falls has a policy regarding the use of flashbangs by its officers. The policy provides that only officers who have been trained in the deployment of such devices will be certified and authorized to deploy them.[6] Officers must receive annual training regarding the deployment of flashbangs. Except in "extreme emergencies," prior authorization from the tactical unit/team commander is required before a flashbang may be used.

The policy states that officers may use flashbang devices "whenever the use of a less-lethal diversion would facilitate entry, enable arrest, and potentially reduce the risk of injury." Docket 20-1 at 1. Specifically, the policy allows for the use of a flashbang for "high-risk warrant services," for people presumed to be under the influence of drugs or alcohol, or for situations where it is necessary to safely resolve the incident. Docket 20-1 at 2.

---

[6] Because the policy was filed under seal and is marked by Sioux Falls as "law enforcement eyes only," Docket 20-1 at 1, the court will only discuss the necessary portions of the policy.

Sioux Falls's policy also urges officers to consider available intelligence information, especially concerning the presence of children or elderly persons, before deploying a flashbang. The policy provides that "[w]henever possible, devices shall be deployed to an area visible to the deploying officers." Docket 20-1 at 2. The policy does not set out any parameters as to how close to a person a distraction device can be deployed. According to Officer Brent Booth, an officer and training instructor for the SFPD, officers generally try to keep the flashbang in the doorway's threshold.

Booth received an instructor certification from Defense Technology. Defense Technology requires a police department to have a certified instructor in order for the department to purchase its products. According to Booth, SFPD tries to have two certified instructors at all times. During the relevant time period, Suurmeyer (the officer who utilized the battering ram during the warrant's execution) was a certified instructor.

Defense Technology requires Sioux Falls to send its officers to training in order for Sioux Falls to purchase flashbangs from the company. During his deposition, Booth testified that the SFPD requires a new SWAT team member to go through initial SWAT team training. During the initial training, officers learn about flashbangs and how to deploy them. Sioux Falls either sends individual officers to an instructor certification program conducted by Defense

Technology, or it has certified instructors, such as Booth, teach officers how to deploy flashbangs.

After the initial training, Booth stated there is no specific training program. Instead, the training is "more along the lines of deployment for HRT training, which is hostage rescue training, which is done throughout the year." Docket 23-1 at 13. Retired officers from the Los Angeles Police Department often facilitate the HRT training. Officers do not receive a certificate saying that they are authorized to use flashbangs.

When Andreasen first became a member of the SWAT team, he received training on how to deploy flashbangs. He has received periodic training as a SWAT team member, including training on how to deploy flashbangs. Andreasen's most recent training occurred in September of 2009. During his training, Andreasen was taught to deploy the flashbang near the point of entry and away from people in the area.

Andreasen did not receive any type of certification that he was trained in the deployment of flashbangs. Booth stated that the only certification offered by Defense Technology is the instructor certification. Andreasen did not have an instructor certification.

Booth testified that if an officer determines that the flashbang cannot be deployed, the officer will deploy the device in a predetermined safe zone or drop zone. Determining the safe or drop zone is part of the planning process

9

when the SWAT team anticipates that a flashbang will be used. Generally the officer assigned to deploy the flashbang will state "no bang" to notify the team if the flashbang is not going to be deployed.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Only disputes over facts that might affect the outcome of the case will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court views the facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal citation omitted). The nonmoving party also receives "the benefit of all reasonable inferences to be drawn from the underlying facts" in the record. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

10

## DISCUSSION

### I.   John Does

Tuchez brought suit against "various other John Does to be named when identified[.]" Docket 1. In his brief opposing defendants' summary judgment motion, Tuchez "agrees that this action rests solely against the City. No other defendants have been named and no claim is made for individual liability under the procedural posture of this case." Docket 21 at 8. Thus, defendants' summary judgment motion as to the John Does' liability is granted.

### II.   Sioux Falls's Liability

Tuchez alleges that Sioux Falls violated his Fourth and Fourteenth Amendment rights. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court "decided that a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original) (discussing *Monell*, 436 U.S. at 694-95). But "a municipality cannot be held liable on a respondeat superior theory, that is, solely because it employs a

tortfeasor." *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389 (8th Cir. 2007) (en banc). A municipality can not be found liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691.

In his brief opposing summary judgment, Tuchez appears to allege that Sioux Falls is liable under § 1983 because its policy on flashbangs as applied to him was unconstitutional and for failing to adequately train Andreasen. During oral argument, Tuchez reiterated that Sioux Falls's *Monell* liability hinged on its policy. In his supplemental brief, however, Tuchez states that "the gravamen of this action is the City's failure to train its employees." Docket 29 at 1. For completeness and because Tuchez's complaint[7] and memorandum opposing summary judgment reference inadequate policy *and* training, the court will analyze both theories of municipal liability.

### A. Sioux Falls's Policy

If the municipality utilizes a policy that is unconstitutional on its face, then it is liable under § 1983 if a municipal officer utilized the policy. *Szabla*, 486 F.3d at 389. During oral argument, Tuchez conceded that Sioux Falls's policy is constitutional on its face.

---

[7] *See* Docket 1 ¶¶ 10-11 ("The use of incendiary devices in the execution of warrants is an express policy endorsed by the Defendant . . . . The actions taken or decisions made by the municipal employee responsible for establishing municipal policies with respect to the use of incendiary devices was deliberately indifferent to the constitutional rights of others.").

Instead, Tuchez argues that the policy, as applied by Andreasen, resulted in a violation of his constitutional rights. Specifically, Tuchez alleges that the policy on how to deploy flashbangs left too much discretion to the officers, did not inform the officers of when to abort a plan to deploy a flashbang, and did not prohibit officers from blindly deploying a flashbang.

In *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385 (8th Cir. 2007) (en banc), the Eighth Circuit outlined the analysis applicable to determine whether a municipality is liable for failing to adopt a policy. *Id.* at 390-91. " '[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences.' " *Id.* at 390 (quoting *Bd. of Cnty. Comm'rs of Bryan Co., Okla. v. Brown*, 520 U.S. 397, 407 (1997)). "Thus, only where a municipality's failure to adopt adequate safeguards was the product of deliberate indifference to the constitutional rights of its inhabitants will the municipality be liable for an unconstitutional policy under § 1983." *Id.* (citations omitted).

The court first determines whether there is a constitutional violation. *See id.* at 391 (determining whether the plaintiff suffered a constitutional violation before addressing whether the municipality's policy caused the violation). The court then determines what the municipality's policy is and whether that policy

13

is unconstitutional. *Id.* at 391-92. The court must also determine "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton*, 489 U.S. at 385.

### 1.   Constitutional Violation

Tuchez contends that his Fourth and Fourteenth Amendment rights to be free from excessive force were violated. Eighth Circuit case law on when a police officer may constitutionally use a flashbang is sparse. In *Cook v. Gibbons*, 308 Fed. App'x 24 (8th Cir. 2009), a SWAT team received a no-knock warrant to search a suspected drug dealer's home. *Id.* at 28. The court granted the no-knock warrant because the suspect was believed to be armed and dangerous; prior searches of the residence had revealed firearms hidden in a trap wall; the suspect had a history of refusing to willingly submit to arrest; and the suspect had a history of keeping exotic pets, namely a lion, on the premises. *Id.* at 29. After the officers were unable to contact anyone in the home and believed they saw movement in the home, they introduced flashbangs and chemical agents through the bedroom and living room windows. *Id.* It is unclear to what extent the officers looked into the residence before deploying the flashbang. The homeowner brought a § 1983 claim against the officers for property damage. *Id.* at 29-30. The Eighth Circuit held that the officers were entitled to qualified immunity because they acted reasonably in accordance with clearly established law. *Id.* at 31.

14

The Eighth Circuit and district courts within the Eighth Circuit have routinely denied motions to suppress when the officers used a flashbang in executing a warrant. *See, e.g.*, *United States v. Stevens*, 439 F.3d 983, 987 (8th Cir. 2006) (affirming the district court's denial of a motion to suppress when the officer threw a flashbang device through a window after he saw the suspect look out the window); *United States v. Baker*, 16 F.3d 854, 855 (8th Cir. 1994) (reasoning that a motion to suppress should be denied when the officers, without knocking or announcing their presence, "lobbed one distraction stun device through the kitchen window and rolled another through the front door."); *United States v. Nguyen*, No. CR99-4068, 2000 WL 34033037, at *5-6 (N.D. Iowa Jan. 25, 2000), *affirmed by United States v. Nguyen*, 250 F.3d 643 (8th Cir. 2001) (reasoning that the officers "were fully justified in the use of the 'flash bang' device" because they believed that the suspect was armed, had body armor, and was a drug trafficker who may have committed murder); *United States v. Rodriguez*, No. 10-05018-01, 2010 WL 5422616, at *10-11 (W.D. Mo. Oct. 26, 2010) (recommending that a motion to suppress for an alleged violation of *Miranda* rights resulting from a flashbang's deployment be denied); *United States v. Workcuff*, No. 02-0018901, 2002 WL 31927426, at *13 (W.D. Mo. Dec. 23, 2002) (reasoning that a search involving a flashbang device was reasonable when the officers believed that they "might encounter firearms" inside "a residence believed to be associated with drug trafficking.").

15

In his affidavit, Andreasen stated that he "looked into the apartment to make sure I placed the distraction device into an unoccupied portion of the apartment. I saw only two individuals who were not near the point of entry. So I placed the distraction device near the door and away from those two individuals." Docket 19 ¶ 9. In his memorandum to the SFPD, Andreasen stated that he "rolled the flash bang inside the doorway." Docket 19-2 at 1.

Tuchez alleges that Andreasen "either did not look where he through [sic] the device or, upon seeing the Plaintiff, deployed the device anyway." Docket 22 ¶ 53. "Therefore, regardless of whether or not Officer Andreasen 'placed' the percussion grenade or 'rolled' it, the device was deployed blindly. It is this situation that implicates the lack of policy and training by the City." Docket 21 at 17.

At the summary judgment stage, the court must view "the record and draw[] all reasonable inferences in the light most favorable to" Tuchez. *Montoya v. City of Flandreau*, 669 F.3d 867, 871 (8th Cir. 2012). Viewed in this light, the record indicates that Andreasen blindly deployed the flashbang, or, alternatively, Andreasen saw Tuchez and threw the flashbang in his direction.

According to circuit precedent, it appears that Tuchez did not suffer a violation of his constitutional rights if Andreasen blindly deployed the flashbang. *See Cook*, 308 Fed. App'x at 29-31 (reasoning that no Fourth Amendment violation occurred when officers introduced flashbangs and

16

chemical agents into the home through the bedroom and living room windows after the officers believed that they saw movement in the residence); *Stevens*, 439 F.3d at 987 (holding that there was no Fourth Amendment violation when "[o]ne of the officers saw an occupant look toward him out of the window and then quickly back away from the window. The officers then threw a 'flash bang' device through the window[.]"); *Baker*, 16 F.3d at 855 (finding no constitutional violation when the officers, without knocking or announcing their presence, "lobbed one distraction stun device through the kitchen window and rolled another through the front door."). Less clear, however, is Sioux Falls's liability if one assumes that the flashbang was deliberately thrown at Tuchez. Thus, the court will assume, without deciding, that Tuchez has shown that his constitutional rights were violated.

### 2.   The Flashbang Policy

The court must now determine what SFPD's policy is regarding the use of flashbangs and whether the policy is constitutional. *Szabla*, 486 F.3d at 391. SFPD's policy on "flash/sound diversionary devices" provides that only officers who have been trained in the deployment of such devices will be certified and authorized to deploy them. Docket 20-1 at 1.

In his affidavit, Andreasen stated that he had received training on how to deploy the distraction device, and his last annual refresher training occurred in September of 2009, about one month before the warrant's execution. Regarding

his training, Andreasen stated that he was taught to look into the area where the device is to be deployed to ensure that no person was in the area. He was further trained to deploy the device near the point of entry. While Tuchez disputes whether Andreasen was certified to deploy flashbangs (which is discussed later), he does not dispute that Andreasen received training in how to deploy flashbang devices. *See, e.g.*, Docket 22 at 9 ("The training records presented in this case establish that Officer Andreasen attended training meetings where he was tasked to deploy distraction devices."); *see also* Docket 19-1 at 1-52 (containing Andreasen's training records).

The policy also states that officers may use a flashbang when the use would facilitate entry into the residence, enable arrest, or reduce any risk of injury. Specifically, the policy allows for the use of a flashbang for "high-risk warrant services," for people presumed to be under the influence of drugs or alcohol, or for situations where it is necessary to safely resolve the incident. Docket 20-1 at 2.

In his affidavit for the search warrant, Scherer stated that a CI had purchased methamphetamine from someone at the residence. During a party, the CI witnessed 25-30 persons buy drugs from people at the residence. The CI observed a black pistol and two shotguns in the residence. A different source of information saw someone associated with the residence point a black pistol at another person. Scherer stated that, based on his experience, "narcotics

traffickers often possess firearms, ammunition, and other weapons." Docket 14-1 at 7. Scherer requested a no-knock warrant because of "the inherent danger involved with executing drug related search warrants involving weapons" and that the no-knock provision "may be necessary for the safety of officers and others[.]" Docket 14-1 at 20.

In executing the warrant, Andreasen stated that the officers believed that the "apartment we were searching housed drug users, drug distributors, large amounts of cash, and various drugs, including methamphetamine, cocaine and marijuana. And, most importantly, we had information that the apartment contained guns and ammunition." Docket 14-2 ¶ 3. Given these facts, the SWAT team decided to use a flashbang device. The SWAT team's decision conformed to the policy, which sanctioned the use of a flashbang in these circumstances. *See also United States v. Turpin*, 920 F.2d 1377, 1387 (8th Cir. 1990) (recognizing that " 'firearms are tools of the [drug dealer's] trade.' " (alteration in original) (quoting *United States v. Koonce*, 884 F.2d 349, 354 n.8 (8th Cir. 1989)).

Sioux Falls's policy also urges officers to consider available intelligence information, especially concerning the presence of children or elderly persons, before deploying a flashbang. The policy states that "[w]henever possible, devices shall be deployed to an area visible to the deploying officers." Docket 20-1 at 2.

19

The court need not decide the appropriateness of a police department's policy regarding flashbangs. Even under the most restrictive interpretation of the constitutional boundaries of when flashbangs are permissible,[8] Sioux Falls's policy is constitutional because the policy limits the use of flashbangs to situations posing a significant threat to officer safety and requires deployment in a visible area.

Tuchez, however, alleges that Sioux Falls should have a policy on how to abort a plan to deploy a flashbang device. Tuchez alleges that if such a policy existed, Andreasen would not have deployed the device in the absence of any actual threat. *See* Docket 21 at 16 ("Because the City has no policy or training with respect to aborting a plan to deploy a flash-bang grenade, Officer Andreasen proceeded to deploy the device in the absence of any actual threat.").

Scherer's affidavit in support of the warrant application stated that there were guns, ammunition, and drugs in the apartment. Tuchez does not contest

---

[8] While Eighth Circuit precedent suggests that officers may blindly deploy a flashbang without violating an individual's Fourth Amendment rights if the use of a flashbang is warranted, other circuits prohibit officers from deploying flashbangs blindly. *See, e.g.*, *Estate of Escobedo v. Bender*, 600 F.3d 770, 784 (7th Cir. 2010) (reasoning that a flashbang is properly deployed when the device is used to protect officer safety and "when officers take a moment to look inside a residence or a room to ensure that no one would be injured by the device before tossing it[.]" (discussing *United States v. Folks*, 236 F.3d 384, 388 n.2 (7th Cir. 2001))); *Boyd v. Benton Cnty.*, 374 F.3d 773, 777-79 (9th Cir. 2004) (reasoning that flashbangs are used unconstitutionally when the officer deploys the device before either looking or sounding a warning).

this evidence and admits that Scherer's "affidavit contains the facts establishing probable cause for issuance of a no-knock search and seizure warrant." Docket 21 at 1. Tuchez also does not dispute that "officers seized two shot guns located in the back bedroom of the apartment, methamphetamine, cocaine, and marijuana, and other contraband." Docket 22 at 7.[9] Thus, Andreasen and the SWAT team believed that there were guns and ammunition in the apartment. And indeed there were guns present in the apartment when Andreasen deployed the flashbang. Under these facts, Tuchez has not offered any evidence that Sioux Falls acted in conscious disregard of his rights by not adopting a policy regarding the abandonment of flashbang use because any such provision would not have prevented his injury.

Moreover, although the policy does not contain a provision stating when a planned flashbang use should be aborted, Booth testified that every plan to deploy a flashbang includes a discussion of how to abort the plan. The team predetermines a safe zone or a drop zone. If the officer is unable to deploy the flashbang, he will state "no bang," which notifies the team that deployment has been abandoned. Tuchez has alleged no facts to dispute that as part of the process in planning to deploy a flashbang the team decides a safe or drop zone

---

[9] In response to this statement of fact offered by defendants, Tuchez's only objection was that "[t]hese facts are not relevant to the issues presented in this case." Docket 22 at 8. During oral argument, Tuchez asserted that the officers only recovered small amounts of drugs. Tuchez, however, did not dispute that officers recovered firearms.

in the event that the flashbang is not used or that the team knows to use "no bang" if a flashbang is not going to be used. Thus, there is an unwritten policy on how to abort a plan to deploy a flashbang.

Because the policy is silent as to when a plan to deploy a flashbang should be aborted, the policy allows officers to use their discretion in determining when to abort a planned flashbang use. The Supreme Court has reasoned that "[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988).

In *Dick v. Watonwan County*, 738 F.2d 939 (8th Cir. 1984), the Eighth Circuit addressed whether a municipality is liable under § 1983 when the municipality's policy leaves discretion to municipal employees. In *Watonwan County*, employees of a county board that operated a human services department relied on an uncorroborated story of a fifteen-year-old girl when recommending to the county's attorney that her parents be involuntarily committed for alcoholism and abuse. *Id.* at 941. It was later established that the girl fabricated the story in order to be placed in foster care "in the hope that she could 'get away with a lot more.' " *Id.* The court reasoned that "[t]he Board's policy was simply that its officers should use their own discretion to decide if facts coming to their attention were serious enough to justify taking a case to

22

the County Attorney." *Id.* at 942. The court held that, while the board could have adopted more detailed guidelines, "the Board's decision to rely on its employees' judgment is certainly not unconstitutional in and of itself, especially in an area where so many diverse fact situations will inevitably present themselves, and in which the exercise of particularized judgment is so important." *Id.*

The decision to deploy a flashbang or abort deploying a flashbang is dependent on the particular facts of the situation confronting the officers. Because officers are faced with innumerable situations, it would be nearly impossible for a single policy to contemplate every situation that officers may face and dictate whether an officer should deploy a flashbang. Sioux Falls was not deliberately indifferent to the constitutional rights of its inhabitants by enacting a policy that left discretion to its police officers in determining when to deploy a flashbang and when to abandon a plan to deploy a flashbang.

Furthermore, without evidence that Sioux Falls had notice of an alleged inadequacy in its flashbang policy or that the inadequacy was so patently obvious, *Monell* liability is not available. *Moyle v. Anderson*, 571 F.3d 814, 819 (8th Cir. 2009). Tuchez has alleged no evidence showing that Sioux Falls had a history of police officers unreasonably deploying flashbang devices.

Tuchez, however, contends that Sioux Falls knew that flashbangs were dangerous and could cause bodily injury because Defense Technology warned

23

of these consequences. Flashbangs are undoubtedly inherently dangerous devices capable of causing property damage, bodily injury, or even death. Defense Technology has warned Sioux Falls about the dangerous nature of its flashbangs.[10] But many of the tools utilized by police officers, including guns, tear gas, and batons, are also inherently dangerous. There is little question that such items are a regular tool of a police officer's job. The fact that a flashbang could cause injury does not make it patently obvious that Sioux Falls's policy should include a provision on when to abandon deployment of a flashbang.

Additionally, while Sioux Falls does not enjoy qualified immunity, "a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Szabla*, 486 F.3d at 393 (emphasis in original) (adopting the approach of the Second Circuit and several district courts). At the time of this incident, the Eighth Circuit had not found a constitutional violation when officers deployed flashbangs without first surveying the area to ensure that the device was not deployed near a person. Thus, it was not clearly established that a city had to have a policy telling officers when to abandon a plan to deploy a flashbang when a risk to the officers' safety existed, as it did here. As

---

[10] *See generally* Docket 23-3 (containing a PowerPoint for an instructor certification program offered by Defense Technology, which includes a learning objective of understanding how to avoid hazards in deploying a flashbang).

a result, to the extent that Tuchez asserts a § 1983 claim against Sioux Falls for utilizing an unconstitutional policy, defendants' motion for summary judgment as to Sioux Falls's liability is granted.

### B.   Training

Tuchez asserts that Sioux Falls's failure to train Andreasen was "so inadequate as to be deliberately indifferent to the rights of others." Docket 29 at 2. Sioux Falls contends that its officer training on flashbangs is adequate.

In *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), the Supreme Court reasoned "that if a concededly valid policy is unconstitutionally applied by a municipal employee" then there are limited circumstances when the city could be liable "if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." *Id.* at 387. The Court held "that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by [prior decisions]—can a city be liable for such a failure under § 1983." *Id.* at 389.

"[I]t may happen that in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of

25

the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. If that occurs, "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.* at 390.

The Eighth Circuit has reasoned that a plaintiff claiming a municipality is liable under § 1983 for failure to train must make a three-part showing: " '(1) the [city's] . . . training practices [were] inadequate; (2) the [city] was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by [the city]; and (3) an alleged deficiency in the . . . training procedures actually caused the plaintiff's injury.' " *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996)).

## 1.  Whether the Training Was Inadequate

Sioux Falls's policy on "flash/sound diversionary devices" restricts the use of diversionary devices to trained members of the tactical unit. "Because of the specialized nature of these devices and the training required to properly deploy them, their use shall be restricted to trained personnel from the Tactical Unit/Team." Docket 20-1 at 1. The policy further provides that "[o]nly personnel who have successfully completed a departmentally approved training course in the proper use and deployment of flash/sound diversionary devices shall be certified and authorized to deploy them during actual operations."

26

Docket 20-1 at 1. The policy also contains a section on "Certification Requirements," which states that "[i]n order to remain certified/authorized to use the devices, personnel shall successfully complete a refresher course on an annual basis." Docket 20-1 at 2.

It appears that Tuchez alleges Sioux Falls's training was inadequate because it did not certify its officers, including Andreasen, in the deployment of flashbangs. *See* Docket 29 at 4-5 (describing the lack of certification). Sioux Falls concedes that Andreasen did not have a certification from the SFPD or Defense Technology to deploy flashbangs. Booth, a trainer for the SFPD, stated that the only certification offered by Defense Technology is the instructor certification. Andreasen did not have an instructor certification.

But in his affidavit, Andreasen stated that he had received training on how to deploy distraction devices. When Andreasen first became a member of the SWAT team, he received training on how to deploy flashbangs.

Andreasen also received periodic training as a SWAT member. According to Booth, the annual training is "more along the lines of deployment for HRT training, which is hostage rescue training, which is done throughout the year." Docket 23-1 at 13. Retired officers from the Los Angeles Police Department often facilitate the HRT training. Tuchez agrees that "[t]he evidence provided in discovery reveals that Officer Andreasen had deployed distraction devices in training situations." Docket 22 at 6; *see also* Docket 22 at 8-9 ("Officer

27

Andreasen . . . had completed training regarding the proper use of distraction devices before the October 29, 2009 search warrant execution. . . . Objection—The training records presented in this case establish that Officer Andreasen attended training meetings where he was tasked to deploy distraction devices."). Andreasen's most recent training occurred about a month before the warrant's execution.

Tuchez argues that Andreasen's training was inadequate because he was not certified to deploy distraction devices. Sioux Falls's policy is internally inconsistent on whether officers must be certified. The policy provides that only "trained personnel" may deploy flashbangs and only officers who complete training will be "certified and authorized" to deploy flashbangs. In order to remain "certified/authorized," an officer must "complete a refresher course on an annual basis."

While Sioux Falls requires SWAT members to attend annual training after their initial SWAT training, Sioux Falls does not require its officers to be certified in the deployment of flashbangs. Instead, as per Defense Technology's requirements, the SFPD ensures that at least one of its officers has received Defense Technology's instructor certification. Suurmeyer, who participated in the planning and execution of the October 29 search warrant, was a certified instructor at the time. Booth was also a certified instructor. While SFPD's policy could be clearer on whether certification was required in order for an

28

officer to be authorized to deploy a flashbang and could have more specifically set out the training program, the lack of this information does not render Sioux Falls's training inadequate.[11]

### 2.    Deliberate Indifference

Even if Sioux Falls's training was in some manner inadequate, Tuchez must show that the failure to train reflects a deliberate or conscious choice by Sioux Falls. *Parrish*, 594 F.3d at 997. Tuchez contends that "the City recognized the need for training, but never implemented a training program. This is not a case where a training program was merely negligently administered. There was no departmentally approved training or certification program at all." Docket 29 at 5. Tuchez cites no factual basis for this claim.

While Sioux Falls has not produced any documents detailing its training program, Booth testified about Sioux Falls's training program, namely that new SWAT team members receive initial SWAT team training and then annual refresher training. Tuchez offers no evidence to dispute Booth's testimony. Moreover, Andreasen's training records support Booth's testimony that SWAT officers received initial SWAT training where they are tasked to deploy

---

[11] Sioux Falls's requirement that officers be certified in how to deploy flashbangs is an internal policy, not a constitutional requirement. *See, e.g., Blair v. Andreason*, No. 8:07-cv-295, 2011 WL 839398, at *3 (D. Neb. Mar. 4, 2011) (collecting cases and reasoning that "[v]iolations of internal policies are irrelevant to whether a constitutional violation occurred.")

flashbangs and annual training where they deployed flashbangs.[12] Thus, Tuchez's claim that Sioux Falls had no training program is not supported by the evidence.

Tuchez also contends that Sioux Falls was deliberately indifferent because it did not certify its officers in the deployment of flashbangs. Tuchez must show that Sioux Falls " 'had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.' " *Id.* (quoting *Andrews*, 98 F.3d at 1076). There must be " 'a patently obvious need for the city to specifically train officers' " not to commit the conduct in question. *Id.* (quoting *Andrews*, 98 F.3d at 1077). In *Parrish*, the Eighth Circuit held that a municipality is not liable on a failure to train theory when "[a]n objectively reasonable officer" would know that the conduct he committed was impermissible. 594 F.3d at 999 ("[W]e do not believe that there is a patently obvious need to train an officer not to sexually assault women . . . An

---

[12] In his initial training in 2005, Andreasen participated in simulations where he was faced "with shoot/don't shoot targets. Flash bangs, snipers, and live fires were utilized during this." Docket 19-1 at 2. Flashbangs were also utilized in a team exercise that took place in a house. Docket 19-1 at 2. In 2007, Andreasen trained for high risk warrant service scenarios. Docket 19-1 at 4-5. In 2008, Andreasen was trained on "deploying smoke and chemical munitions" and warrant service as part of his annual SWAT training. Docket 19-1 at 11. During this training, 14 flashbangs were deployed. Docket 19-1 at 11. In 2009, Andreasen again underwent SWAT training where the team practiced warrant service and hostage rescue. Docket 19-1 at 15-16. Tuchez offers no facts to dispute this evidence.

objectively reasonable officer would know that it is impermissible to touch a detainee's sexual organs by forcible compulsion.").

Viewing the facts in the light most favorable to Tuchez, Andreasen either deployed the flashbang near Tuchez after he saw him or deliberately threw the flashbang at Tuchez. A flashbang is an incendiary device whose use is controlled by the Bureau of Alcohol, Tobacco, Firearms, and Explosives. It functions like a grenade and, according to Defense Technology, can cause death, injury, and/or property damage, including causing a fire. Given the nature of the device and common sense, an objectively reasonable officer would know that it is impermissible to either deploy the device near a person or throw the device at a person.

Sioux Falls's policy confirms that flashbangs "shall be deployed to an area visible to the deploying officer," but does not specifically tell officers not to deploy it directly next to a person or not to throw it at a person. While it may have been wise to tell officers not to deploy a flashbang near a person, it is not so obvious that not doing so would result in an officer actually deploying a flashbang near a person or throwing a flashbang at a person. *See Parrish*, 594 F.3d at 999 ("Thus, while it may have been wise to tell officers not to sexually assault detainees, it is not so obvious that not doing so would result in an officer actually sexually assaulting a female detainee."). Thus, Sioux Falls was

31

not deliberately indifferent in failing to certify officers in the deployment of flashbangs.

### 3.   Causation

Even if Sioux Falls were deliberately indifferent to Tuchez's rights, Tuchez must show that the alleged deficiency in the training procedure actually caused his injury. *Parrish*, 594 F.3d at 997. While "causation is generally a question of fact," when "the causal link is too tenuous such that the questions is so free from doubt as to justify taking it from the [fact finder]," the court may decide the issue as a matter of law. *Id.* at 1000 (alteration in original) (citations and quotations omitted). The causation analysis is rigorous when the government has not directly inflicted the injury. *Id.* at 999 (citing *Szabla*, 486 F.3d at 390). Causation does not exist if the "constitutional violation was 'too remote a consequence' " of the municipality's action " 'to hold [it] responsible under the federal civil rights law.' " *Id.* at 1000 (quoting *Martinez v. California*, 444 U.S. 277, 285 (1980)).

Tuchez must " 'demonstrate the close relationship necessary to conclude that the city's failure to properly train [Andreasen] *caused* him to [injure Tuchez] or even raises a question of fact as to causation.' " *Id.* at 999 (emphasis in original) (quoting *Andrews*, 98 F.3d at 1077). Sioux Falls's " 'deliberate conduct' " must be " 'the moving force behind the injury alleged.' " *Id.* (quoting *Brown*, 520 U.S. at 404). In conducting this analysis, the court asks, "[w]ould

32

the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *City of Canton*, 489 U.S. at 391. The court must predict "how a hypothetically well-trained officer would have acted under the circumstances[.]" *Id.*

Tuchez alleges that Andreasen either did not look where he threw the device or, after seeing Tuchez, threw the device at him. Even though Sioux Falls could have certified Andreasen or trained him differently, Andreasen's actions are too remote a consequence of any such training failure to meet the causation standard. *See Parrish*, 594 F.3d at 1001 ("Here, even though Fite should have been more properly trained on the 'contents of the law,' Fite's intentional sexual assault of Parrish is too remote a consequences of such a failure to meet the rigorous causation standard necessary to hold the county liable."). Tuchez has not demonstrated the close relationship necessary to show that any failure by Sioux Falls to certify Andreasen caused Andreasen to violate Tuchez's Fourth Amendment rights.[13]

Tuchez further argues that "not only does the City have no specific policy requiring a certification and recertification program, beyond the fact of its policy, the City has no training with respect to when these devices should not

---

[13] Tuchez chose not to bring a claim against Andreasen. Tuchez cannot back door a claim against Andreasen by claiming that Sioux Falls is liable for his action because that would be a respondeat superior claim, which is an impermissible avenue of relief in the § 1983 context. *Szabla*, 486 F.3d at 389.

be deployed because of the imminent danger of injury. This complete lack of training was the moving force behind Tuchez' [sic] injury." Docket 29 at 6 (citing Booth's Deposition).

As stated above, however, Booth testified that officers are trained to deploy flashbangs near the point of entry and not to deploy flashbangs near children or elderly persons. The policy confirms this practice. Moreover, a plan to deploy a flashbang also contains a plan on when to abandon the plan to deploy a flashbang, which includes determining a safe zone to drop the flashbang and stating "no bang" if the officer determines that deploying a flashbang would be dangerous. Tuchez offers no facts to dispute Booth's testimony and, therefore, there is no genuine issue of material fact that Sioux Falls trained its officers to minimize danger to themselves and others in deploying flashbangs. Thus, to the extent that Tuchez alleges that Sioux Falls is liable for failing to train Andreasen, defendants' motion for summary judgment is granted.

## CONCLUSION

Tuchez asserts a § 1983 claim for a violation of his Fourth and Fourteenth Amendment rights against Sioux Falls and John Does. Tuchez agrees that summary judgment is proper on his claims against the John Does and, thus, summary judgment is granted on those claims. Regarding Sioux Falls's § 1983 liability, Tuchez argues that Sioux Falls utilized an

34

unconstitutional policy on how to deploy flashbangs. Because Tuchez has alleged no facts to suggest that Sioux Falls was deliberately indifferent in adopting its policy, Sioux Falls is not liable regarding its policy. Tuchez also asserts that Sioux Falls failed to adequately train its officers in how to deploy flashbangs. Because Tuchez has not shown that any failure by Sioux Falls to train Andreasen caused Andreasen to violate his constitutional rights, Sioux Falls is not liable on a failure to train claim. Thus, defendants' motion for summary judgment on Tuchez's claims against Sioux Falls is granted. Accordingly, it is

ORDERED that defendants' motion for summary judgment (Docket 10) is granted.

Dated June 29, 2012.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE